IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

|  |  |  |
|---|---|---|
| THE SMOKE SHOP, LLC, | ) | |
| A Wisconsin Limited Liability Company, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | Case No. _____ |
| vs. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA and | ) | |
| DRUG ENFORCEMENT ADMINISTRATION, | ) | |
| | ) | |
| Respondents. | ) | |

_____)

### DECLARATION OF DAVID S. YARMO IN SUPPORT OF MOTION OF THE SMOKE SHOP, LLC FOR RETURN OF SEIZED PROPERTY

DAVID S. YARMO declares under penalty of perjury as follows:

1.      I am a resident of Delavan, Wisconsin and based upon matters personally known to me, as learned in the manner set forth below, I make this declaration in support of the motion of my company, The Smoke Shop, LLC ("The Smoke Shop"), under Rule 41(g) of the Federal Rules of Criminal Procedure, for return of its property that was seized and is being held by the United States Drug Enforcement Administration ("DEA").

*The Seizure of The Smoke Shop's Property*

2.      On September 13, 2012 two agents from the DEA, along with two county and one local police officers, came into my retail store in Delavan, Wisconsin, The Smoke Shop, and seized over $110,000.00 of legal incense products from the store shelves, informing me that they wanted to test them to determine if they contained

1

controlled substances. They asked if I would consent to their taking these products for testing and informed me that the testing would take two to three weeks. They also stated that they would give back any product that did not contain any illegal substance. Because I wanted to cooperate with law enforcement, and even though I believed then (and still do) that none of our products contained any illegal substance, I consented to the products being taken temporarily for testing purposes, for the short time they had indicated.

3.       I was also informed by the officers and agents that the products would be kept at the local police station, which is located approximately one block from my shop in Delavan, that the DEA would take a sample of each of the different products for testing, and that this would be done in "two to three weeks." My wife was present and heard this representation. We were specifically told that "you will get back what is not illegal." The only reason I consented to the taking of the products was because I was told that the taking would be temporary, unless of course there were controlled substances found in the products, something I believed was not at all the case.

4.       Several days later I went to the police station to ask about the storage of my products and was informed that, instead of being stored locally, as promised, the DEA had taken custody of all the incense products and shipped them to a DEA facility.

5.       Thereafter, I retained an attorney, John J.E. Markham, II and on October 16, 2012 he and I met with the DEA agents in Milwaukee about the seizure. They confirmed to us that the DEA had in fact taken custody of all the incense products taken from my shop. We inquired about the testing of my incense products and we were told by the agents that the seized Smoke Shop products had been sent to a testing laboratory in Minnesota and that it would take "two or three months," not two or three weeks, to test

2

the incense products that they had taken. Most importantly, we were told that there was "no way" the DEA would give me back the products they had seized from our store. The DEA agent, Scott Albrecht, informed us that they would take an unspecified time to test and that if they did not in fact contain any controlled substances, the DEA would ship them off to the Food and Drug Administration and that we would "never get them back – never see them again" and that I "could sue them for it."

6.      Accordingly, for the reasons stated in this declaration, I respectfully move this Court to order the DEA forthwith to return my products to our store unless it can show this Court that they contain controlled substances, which, I believe, they do not.

*The Specific Property Seized by the DEA*

7.      The property seized and now held by the DEA is valuable. I attach hereto as Exhibit A the inventory of the property seized, which was given to me by the Delavan Police Department. Each of the eighteen pages of Exhibit A sets forth the name of a different product and the amounts of each product that was seized. I list them separately along with the retail value of each:

(i)      Syn Fire products; 909 units; retail value $20,861.55

(ii)     Johnny Appleseed products; 394 units; retail value $4,623.10

(iii)    Tripple Xtract Inigma products; 15 units; retail value $539.85

(iv)     Tripple Extract Stella products; 8 units; retail value $287.92

(v)      Legal Devil Grape products; 33 units; retail value $1,815.00

(vi)     Legal Devil Blueberry products; 33 units; retail value $1,815.00

(vii)    Legal Devil Strawberry products; 33 units; retail value $1,815.00

(viii)   Legal Devil Hyptonic products; 33 units; retail value $1,815.00

3

(ix)  Legal Devil Kush products; 33 units; retail value $1,815.00

(x)  Legal Devil Cotton Candy products; 34 units; retail value $1,870.00

(xi)  Mary Jane Puffy products; 24 units; retail value $550.80

(xii)  Mary Jane Primo products; 413 units; retail value $12,385.87

(xiii)  Mary Jane Xtreme products; 90 units; retail value $4,050.00

(xiv)  Mary Jane Voodoo products; 323 units; retail value $8,075.00

(xv)  Mary Jane Irie products; 545 units; retail value $16,344.55

(xvi)  Mary Jane Burny products; 276 units; retail value $6,334.20

(xvii)  Mary Jane Permagrin products; 201 units; retail value $5,025.00

(xviii)  Witch Dr. products; 1,243 units; retail value $22,374.00

TOTAL RETAIL VALUE: $112,396.84

8.  This is a great deal of money for a small shop like ours. We were counting on selling these products over the fall and early winter months to support our store and family needs for the year. It is a substantial hardship not to have these products and the revenues they would have generated. Based upon past sales from such products, the inventory seized by the DEA would have sold by Christmas. Incense is particularly popular during the holiday season.

9.  These products are all various types of aromatic incense. They are burned in an open container and, as burned, they emanate various smells that are pleasurable, such as the scent of blueberries, raspberries, strawberries, or various flower smells. I do not believe that any of these products contain any controlled substances. Moreover, the label on each packet of each product states clearly "NOT FOR HUMAN CONSUMPTION."

4

*The Nature of the Incense Products Taken by the DEA*

10. Our incense products are lawful and are sold for the lawful purpose of burning to give off pleasurable odors. We sell incense in three forms, two of which – on a stick or cone-shaped – are congealed, held together by certain chemical binding products that make them burn faster. The third form is loose incense that burns more slowly and is free of the binding chemicals.

11. This third type, loose incense, is the product seized by the DEA because, the DEA agents wrongly assumed, as they told me on the day of the seizure, it is like tobacco and can be smoked. They also told me they believe that it contained illegal drugs. I respectfully disagree. All of our loose incense products come from manufacturers that certify to us that these products do not contain any illegal substances. They are also all plainly marked "NOT FOR HUMAN CONSUMPTION." It is thus plainly *not* offered by our shop to be ingested.

12. Incense has been used since the beginning of recorded history. See Exhibit "A" hereto, "Encyclopedia of the Catholic Church – Incense," which outlines its many historic uses and the fact that its use is commended in the Bible. Laviticus 6:15; 1 Chronicles 9:29. The Encyclopedia notes that references to its use in the New Testament "would suggest an early familiarity with it in Christian worship." The Encyclopedia also notes:

> Incense, with its sweet smelling perfume – and high-ascending smoke – is typical of the good Christian's prayer, which, enkindled in the heart by the fire of God's love and exhaling the odor of Christ, rises up a pleasing offering in His sight.

5

The Encyclopedia goes on to explain how incense is used in Catholic Sunday services. Indeed, in the Christian faith, frankincense, a form of powdered incense, is believed to have been offered by the Three Wise Men as one of their gifts to the Baby Jesus. It is thus a very legitimate product with a long history.

13.     While our customers do not have such a noble use for the loose incense we sell, it is burned in open air as an element of a wide range of activities, apart from Catholic Church services and other religious ceremonies.  It is a well-accepted air freshener or deodorant to eliminate unpleasant odors such as those caused cat litter, other pet activity, stale cigar and cigarette smoke, or stale food odors. It is frequently used during massage therapy and at parties for the nice smells that it releases into the air. Depending on the herbs involved, it can, when burned, give off pleasing odors such as lemon, all the different berries, lavender, numerous recognizable and pleasant plant smells, and mint, among many other desirable smells. There is absolutely nothing inherently illegal about it.

14.     Loose incense – which is a powder type form – is more pure than cone or stick incense because the latter are bound by chemicals that act as a burning accelerant. They thus burn faster and the binding chemicals become part of the smoke. Loose incense does not contain these accelerants and thus burns more slowly and purely. It is burnt in a dish over a hot coal plate that we sell in the shop. The flat, coal-like plate is lit and once it is red hot, the incense is placed over it in the dish so that it burns and gives off a pleasing aroma.  In past times, loose incense was burned as follows, as described in Wikipedia: "Loose incense powder . . . is sometimes burned without further processing. They are typically packed into long trails on top of wood ash . . . ." There is nothing

inherently illegal about the selling of our products. Whatever they contain, and we

believe they contain no marijuana-type products or other illegal substances, they are not

sold by us to be smoked but rather to be used in one of the many ways that have evolved

over the centuries for incense burning.

*Our Family Store*

15.     We are a small, family-run business. My family purchased The Smoke

Shop, a business that had been operating in Delavan for many years, in 2006, after we

had formed The Smoke Shop, LLC to take ownership of it. I, along with my wife and her

father, are the only persons who work in the shop. It is located on Main Street in Delavan,

near the police station. Our advertisement in the local *Yellow Pages*, depicted below,

accurately describes the various products we sell:

THE SMOKE SHOP


Tie Dies  -  Hats  -  Bags
Incense  -  Oils  -  Accessories
Hookahs  -  Bohemian Apparel
Specialty Supplies
Cigarettes  -  Gifts  -  Cigars  -  RYO
Specialty and Imported Cigarettes
Tobacco Free/Nicotine Free Cigarettes

16.     Our shop sells all of the above-advertised products, as well as specialty

health drinks, pipe tools, pipe cleaners and pipe and tobacco cases, tobacco products for

pipe and roll-your-own cigarette products, cigarette tobacco, filters, and cases, humidors,

cigar cutters and punches, fair traded clothing (meaning clothing manufactured in such a

7

way that it does not violate any child labor laws), mukluks hats, mittens, gloves, shirts and pants, bumper stickers and costume jewelry.

17.     We are a popular store in and around the Delavan area and our customers include members of the local police department, attorneys and judges. We hire a local accountant to prepare our income taxes and file and pay them on time. We withhold and pay all required payroll taxes. Our limited liability company is in good standing with the State of Wisconsin and always has been. We are good citizens of the community. We have made contributions to the local community, sponsoring concerts in the local park, donating sound equipment to Delavan's Park and Recreation Department, and making donations to the Town as well. We are law-abiding citizens and our shop complies with all local state and federal laws.

18.     We obtain our incense products from various manufactures that sell them to us wholesale. We sell them openly in our shop along with our other products. We do not believe that there is any illegal substance in these products or we would not sell them.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge and belief.

Executed this 21st day of November, 2012, in Delavan, Wisconsin.

David S. Yarmo

8

# EXHIBIT A TO YARMO DECLARATION

# (Catholic Encyclopedia on Incense)

# Incense

GET THE
CATHOLIC ENCYCLOPEDIA ON
CD-ROM



This entire website is available on CD-ROM.
Includes the Catholic Encyclopedia,
Church Fathers, Summa, Bible and more...
SALE: 50% off if you buy now...
*FREE Shipping Worldwide...*

## Click here...

(Latin *thus*, Gr. *thumiama*), an aromatic substance which is obtained from certain resinous trees and largely employed for purposes of religious worship. The word is also used to signify the smoke or perfume arising from incense when burned.

## Nature

In ancient times incense was furnished by two trees, viz. the *Boswellia sacra* of Arabia Felix, and the *Boswellia papyrifera* of India, both of which belong to the Terebinthian family. Mention is made of it in Numbers 7:14; Deuteronomy 33:10, etc. It was procured from the bark much as gum is obtained at present. To enhance the fragrance and produce a thicker smoke various foreign elements were added (cf. Josephus, "Bell. Jud.", V, 5). These ingredients generally numbered four, but sometimes as many as thirteen, and the task of blending them in due proportion was assigned under the Old-Law ordinances to particular families (Canticles 3:6).

## Use

The use of incense was very common. It was employed for profane purposes as an antidote to the lassitude caused by very great heat, as perfumes are now used. Mention of its introduction into pagan worship is made by classical writers (cf. Ovid, "Metamorph.", VI, 14, Virgil, "AEneid", I, 146). Herodotus testifies to its use among the Assyrians and Babylonians, while on Egyptian monumental tablets kings are represented swinging censers. Into the Jewish ritual it entered very extensively, being used especially in connexion with the eucharistic offerings of oil, fruits, and wine, or the unbloody sacrifices (Leviticus 6:15). By the command of God Moses built an altar of incense (cf. Exodus 30), on which the sweetest spices and gums were burned, and to a special branch of the Levitical tribe was entrusted the office of daily renewal (1 Chronicles 9:29).

When, exactly, incense was introduced into the religious services of the Church it is not easy to say. During the

Case 2:12-cv-01186-RTR   Filed 11/21/12   Page 10 of 12   Document 1-2

first four centuries there is no evidence for its use. Still, its common employment in the Temple and the references to it in the New Testament (cf. Luke 1:10; Revelation 8:3-5) would suggest an early familiarity with it in Christian worship. The earliest authentic reference to its use in the service of the Church is found in Pseudo-Dionysius ("De Hier. Ecc.", III, 2). The Liturgies of Sts. James and Mark — which in their present form are not older than the fifth century — refer to its use at the Sacred Mysteries. A Roman Ordo of the seventh century mentions that it was used in the procession of the bishop to the altar and on Good Friday (cf. "Ordo Romanus VIII" of St. Amand). The pilgrim Etheria saw it employed at the vigil Offices of the Sunday in Jerusalem (cf. Peregrinatio, II). Almost all Eastern liturgies bear witness to its use in the celebration of the Mass, particularly at the Offertory. In the Roman Church incensation at the Gospel of the Mass appears very early — at the Offertory in the eleventh, and at the Introit in the twelfth century, at the Benedictus and Magnificat of the canonical Hours about the thirteenth century, and, in connexion with the Elevation and Benediction of the Blessed Sacrament, about the fourteenth century. "Ordo Romanus VI" describes the incensation of the celebrant, and in the time of Durandus (Rat. off. Div.) the assisting clergy were incensed. In the present discipline of the Western Church incense is used at solemn Mass, solemn blessings, functions, and processions, choral offices, and absolutions for the dead. On these occasions persons, places, and things such as relics of Christ and the saints, crucifix, altar, book of Gospels, coffin, remains, sepulchre, etc. are incensed. When used the incense is generally burned. There are two cases, however, when it is not consumed:

- the grains put into the Paschal candle and
- the grains put into the sepulchre of consecrated altars.

At Mass incense is generally blessed before use.

# Symbolism and manner of incensing

Incense, with its sweet-smelling perfume and high-ascending smoke, is typical of the good Christian's prayer, which, enkindled in the heart by the fire of God's love and exhaling the odour of Christ, rises up a pleasing offering in His sight (cf. Amalarius, "De eccles. officiis" in P.L., CV). Incensing is the act of imparting the odour of incense. The censer is held in the right hand at the height of the breast, and grasped by the chain near the cover; the left hand, holding the top of the chain, is placed on the breast. The censer is then raised upwards to the height of the eyes, given an outward motion and slightly ascending towards the object to be incensed, and at once brought back to the starting point. This constitutes a single swing. For a double swing the outward motion should be repeated, the second movement being more pronounced than the first. The dignity of the person or thing will determine whether the swing is to be single or double, and also whether one swing or more are to be given. The incense-boat is the vessel containing the incense for immediate use. It is so called from its shape. It is generally carried by the thurifer in the disengaged hand.

Case 2:12-cv-01186-RTR   Filed 11/21/12   Page 11 of 12   Document 1-2



# About this page

**APA citation.** Morrisroe, P. (1910). Incense. In The Catholic Encyclopedia. New York: Robert Appleton Company. Retrieved November 21, 2012 from New Advent: http://www.newadvent.org/cathen/07716a.htm

**MLA citation.** Morrisroe, Patrick. "Incense." The Catholic Encyclopedia. Vol. 7. New York: Robert Appleton Company, 1910. 21 Nov. 2012 <http://www.newadvent.org/cathen/07716a.htm>.

**Transcription.** This article was transcribed for New Advent by Kevin Cawley.

**Ecclesiastical approbation.** *Nihil Obstat.* June 1, 1910. Remy Lafort, S.T.D., Censor. *Imprimatur.* +John Cardinal Farley, Archbishop of New York.

**Contact information.** The editor of New Advent is Kevin Knight. My email address is feedback732 *at* newadvent.org. (To help fight spam, this address might change occasionally.) Regrettably, I can't reply to every letter, but I greatly appreciate your feedback — especially notifications about typographical errors and inappropriate ads.

Case 2:12-cv-01186-RTR   Filed 11/21/12   Page 12 of 12   Document 1-2